

Opinions of the United
States Court of Appeals
for the Third Circuit

9-29-1999

# United States v. Holmes

Precedential or Non-Precedential:

Docket 98-1703

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"United States v. Holmes" (1999). *1999 Decisions.* Paper 267.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/267

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1703

UNITED STATES OF AMERICA

v.

DANIEL G. HOLMES,
        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 97-cr-00424-1)
District Judge: Hon. Robert F. Kelly

Submitted Under Third Circuit LAR 34.1(a)
September 7, 1999

Before: SLOVITER and ROTH, Circuit Judges,
and POGUE, Judge United States Court of
International Trade*

(Filed September 29, 1999)

Regina M. Coyne
David L. McColgin
Maureen Kearney Rowley
Defender Association of Philadelphia
Federal Court Division
Philadelphia, PA 19106

 Attorneys for Appellant

_____

*Hon. Donald C. Pogue sitting by designation.

Thomas M. Gallagher
Michael R. Stiles
Walter S. Batty, Jr.
Office of United States Attorney
Philadelphia, PA 19106

 Attorney for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Daniel Holmes, a disbarred attorney and accountant, appeals from the sentence imposed by the District Court following his plea of guilty to two indictments. One indictment charged Holmes with conspiracy; bank, wire, and mail fraud; interstate transportation of stolen property; income tax fraud; and forgery. The other charged him with forgery of two federal judges' signatures. The District Court sentenced Holmes to 96 months in prison, ordered him to pay restitution in the amount of $1,899,838.80, and imposed a special assessment of $8,650.00.

Holmes appeals his sentence, challenging the District Court's upward departure from the sentencing guidelines by two levels for extraordinary abuse of a position of trust, the court's imposition of restitution without formally determining his ability to pay, and the court's calculation of the amount of the special assessment.

I.

We review the underlying facts briefly as they give some indication of the nature and extent of the schemes Holmes devised between 1994 and 1996 to defraud his clients and acquaintances.

In October of 1994, one of Holmes' clients was involved in a protracted business dispute. In anticipation of litigation, Holmes asked his client to deposit money in an escrow account under Holmes' name while the matter was being resolved. Holmes then prepared a fabricated

settlement agreement for a non-existent lawsuit and forged the opposing party's signature. In connection with this scheme, Holmes produced what he represented to be court orders to which he forged the signatures first of United States District Judge James Giles and later of United States District Judge Norma L. Shapiro. Thereafter, Holmes withdrew money from the escrow account that his client had funded and forwarded that money to his client as the purported settlement. To distract the client's requests for the additional funds he was to receive under the "settlement," Holmes invented more lies.

Also in October of 1994, Holmes, presented with several bonds belonging to the aunt and uncle of his neighbor, forged the signature of his neighbor's dying uncle without the neighbor's knowledge, had a friend notarize the signature, redeemed the bonds, and deposited the money, totaling over $150,000, in his own account.

In January of 1995, Holmes created a fraudulent low-income housing investment venture and fabricated documents that attested to the viability and soundness of the prospect. Eleven investors made checks payable to an account held by Holmes. After making one quarterly payment to his investors, Holmes admitted that he had spent all of the investors' money.

Shortly thereafter, Holmes defrauded a client who had come to him with a tax problem by eliciting money from the client for a contrived settlement with the federal government. Holmes then used the "settlement" money for his own gain. He elicited additional money from the same client for a non-existent state tax liability, and then again for an investment scheme.

In another scheme in 1995, Holmes persuaded two clients who were finally in a position to satisfy their outstanding federal tax obligations to write checks which he undertook to use to pay off taxes owed but which he instead placed straight into his bank account. Although he eventually returned the money, he failed to satisfy his clients' outstanding tax obligations as promised. In yet another tax scheme, Holmes took advantage of two clients for whom he had been filing business tax returns for years

by selling them fictitious tax credits and claiming non-existent low-income housing tax credits on their tax returns.

Further, in early 1996 Holmes, acting in conspiracy with two of the three cousins of a man who died intestate, prepared a false will naming one of the cousins as the executor and naming the two cousins as the sole beneficiaries of the estate. Holmes forged the signature of the deceased testator and, acting with the two cousins, established an estate account from which all three drew for their personal benefit.

In addition, Holmes engaged in money laundering. Between February and June of 1996, he withdrew money from the account established in the fake will scheme and purchased cashier's checks from Mellon Bank in an attempt to conceal the origin of the money. Thereafter, he used the cashier checks to pay off victims of his other schemes and to make purchases for his general benefit.

Eventually, all of the above-mentioned schemes were discovered and Holmes was charged in two indictments. Holmes pled guilty pursuant to a plea agreement in exchange for the dismissal of 114 counts from one indictment. His sentence was calculated under the Sentencing Guidelines. He was sentenced for fraud pursuant to U.S.S.G. S 2F1.1, which has a base offense level of 6, to which there were enhancements of twelve levels for the amount of loss, U.S.S.G. S 2F1.1 (b)(1)(M); two levels for more than minimal planning, U.S.S.G.S 2F1.1 (b)(2)(A); two levels for vulnerable victim, U.S.S.G. S 3A1.1; four levels for aggravating role, U.S.S.G. S 3B1.1(a); and two levels for abuse of a position of trust or use of a special skill, U.S.S.G. S 3B1.3. At the request of the government, the District Court departed upwards two additional levels pursuant to S 5K2.0 based on Holmes' extraordinary abuse of a position of trust because the court believed the two-level enhancement for abuse of a position of trust was insufficient.

4

II.

A.

Holmes asserts that the District Court erred in granting an upward departure for extraordinary abuse of trust. He argues that there was nothing extraordinary about his situation that warranted the upward departure, and contends that the other level enhancements included in his sentence accounted for any egregious actions on his part so that the two-level upward departure was in effect double counting.

In determining the appropriateness of an upward departure, we must first determine "whether a factor is a permissible basis for departure under any circumstances," or, in other words, we must decide as a matter of law if departure was warranted. Koon v. United States , 518 U.S. 81, 100 (1996). This phase of the review is plenary. United States v. Kikumura, 918 F.2d 1084, 1098 (3d Cir. 1990). If it is established that an upward departure is appropriate, we must then determine whether the degree of the departure was reasonable. Id.

Under U.S.S.G. S 5K2.0, a district court may either increase or decrease the offense level if it believes that the level contemplated by the sentencing guideline does not accurately reflect the nature of the case. U.S.S.G. S 5K2.0; United States v. Corrigan, 128 F.3d 330, 333 (6th Cir. 1997). Grounds for departure include the finding of an aggravating circumstance not contemplated by the Commission or, if contemplated, the presence of a factor that far exceeds the expectation of the commissioners. U.S.S.G. S 5K2.0; United States v. Ventura, 146 F.3d 91, 97 (2d Cir. 1998). Also, if a factor is not normally part of the equation in sentencing outside the guideline range, but is present in an unusual degree and distinguishes a case from the heartland of cases covered by the guidelines, departure is appropriate. U.S.S.G. S 5K2.0. Finally, the commentary to S 5K2.0 suggests that a court may be presented with a case where none of the characteristics or circumstances individually distinguish the case from the heartland cases, yet the court may find that a combination of the characteristics and circumstances make it extraordinary.

5

Holmes argues that his activities in this case were precisely of the kind envisioned by the sentencing guidelines, and therefore could not be the subject of a departure. The guideline for abuse of a position of trust, S 3B1.3, provides that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," the court should increase the sentence by two levels. Holmes refers to our opinion in United States v. Copple, 24 F.3d 535, 548 (3d Cir. 1994), where we held that a scheme involving thirty-one victims and millions of dollars of stolen money was not outside the heartland of fraud cases. Id. at 548. Copple is not analogous to the situation here because the defendant there was not charged with abuse. Rather, the District Court in Copple upwardly departed based on the number of victims and the amount of monetary loss involved. Id. at 547.

Holmes also refers to United States v. Bennett , 161 F.3d 171 (3d Cir. 1998), where the district court imposed a two-level enhancement for abuse of trust but did not upwardly depart for the same offense even though the scheme in that case was extensive. In Bennett, however, the prosecution did not ask for an upward departure, so the court had no opportunity to review whether the abuse of trust in that case fell outside the heartland. See id. at 195-96.

The District Court in this case explained its reasons for the upward departure as follows:

> I am of the view that the two point enhancement for abuse of position of trust under 3B1.3 is inadequate to reflect the widespread fraud and criminal activity in this case. The act of signing a judge's signature, the act of preparing a will and forging it after a decedent has died and all of the other various acts of a violation of trust to the various victims, some as attorney, some as accountant, I find are extraordinary.

App. at 72. The court later added:

> A case like this, you don't really grasp the case because it's just figures and documents, but if you read the victim impact statements, it comes alive and

6

there are people who will be suffering from this for the rest of their lives because it has affected their retirement income in some cases, it has affected their expectations in others.

App. at 87.

Holmes perpetuated various and distinct schemes, all involving abuse of positions of trust. He prepared legal documents out of whole cloth, and then forged the signature of two federal judges. He defrauded clients, next door neighbors, and investors. His activities were successful in eight separate schemes because of the positions of trust he held. We see nothing in the background and commentary sections that accompany the abuse-of-trust guideline that suggests the Sentencing Commission envisioned multiple acts of abuse of trust to the degree that was present in this case. Cf. Ventura, 146 F.3d at 97 ("[T]he language of the guideline and commentary suggest that the rule was drafted without consideration that the defendant might engage in multiple episodes of obstructive conduct."). Accordingly, we agree with the District Court that the type and extent of Holmes' activities are beyond our experience and are not of the kind envisioned by the guideline for abuse of a position of trust.

Holmes next contends that the departure is not justified because the factors not sufficiently accounted for under the abuse-of-trust provision are accounted for elsewhere in the adjustments that were made. First, he argues that the twelve-level enhancement he received for the amount of loss under U.S.S.G. S 2F1.1(b)(1)(M) considers the same factors on which the District Court based its decision to upwardly depart. He points us to the District Court's statement that the motion for upward departure was granted because"the two-point enhancement for abuse of a position of trust under 3B1.3 is inadequate to reflect the widespread fraud and criminal activity in this case." Contrary to Holmes' assertion, however, the District Court's statement focuses on the impact and suffering caused by Holmes' deceptions and the breadth and manner in which Holmes carried out his endeavors while in a position of trust, rather than on the number of people affected or the amount of economic loss incurred.

7

Nor does the two-level enhancement Holmes received for "more than minimal planning," U.S.S.G. S 2F1.1(b)(2)(A), account for his extraordinary abuse of trust. We have stated that "[w]hether a defendant's crime involved `more than minimal planning' considers the deliberative aspects of a defendant's conduct and criminal scheme, and does not necessarily include consideration of the defendant's position of trust, if any." United States v. Georgiadis, 933 F.2d 1219, 1226 (3d Cir. 1991). If, as Georgiadis clearly indicates, adjustments for more than minimal planning and abuse of a position of trust do not amount to double counting, it follows that a departure based on extraordinary abuse of trust does not doubly count factors considered in an adjustment for more than minimal planning. Similarly, Holmes' increase under U.S.S.G. S 3A1.1 for a vulnerable victim does not speak to the manner and extent to which he defrauded those victims, and the four-level increase Holmes received for an "aggravating role" under U.S.S.G. S 3B1.1(a) reflects his leadership role in his extensive criminal activities rather than the egregious manner in which he abused his position of trust.

Finally, the government did not move for departure solely on the fact that Holmes possessed a special skill as an attorney, as Holmes suggests. Instead, the government merely emphasized the fact that Holmes was in a position of trust because he had the special skills that made others confident in his abilities. U.S.S.G. S 3B1.3 (abuse of trust) does not prohibit an enhancement under S 3B1.1 (aggravating role) if both prongs of U.S.S.G. S 3B1.3 are violated. Accordingly, we conclude that the District Court's decision to upwardly depart for extraordinary abuse of trust was not made on a legally impermissible basis.

Having reached that conclusion, it requires considerably less discussion to affirm the reasonableness of the degree of departure. In Koon, the Supreme Court advised that on this issue we must allow the district courts considerable discretion to determine the degree to which a departure is warranted. 518 U.S. at 100. The departure of an additional two levels for abuse of a position of trust under the circumstances of this case was reasonable. We therefore hold that the two-level upward departure was within the District Court's discretion.

B.

Holmes challenges the Order requiring him to pay restitution in the amount of $1,899,784.80 for all the offenses he committed between 1994 and 1996. Our review of this legal issue is plenary. Holmes contends that under the Victim and Witness Protection Act (VWPA), 18 U.S.C. S 3664, the statute applicable to all offenses occurring prior to April 24, 1996, the district courts were required to make a determination of the defendant's ability to pay before imposing restitution. In this case, all but one of Holmes' schemes took place prior to April 24, 1996. The government agrees with the need for a remand. It reads the District Court's order as properly ordering $1,320,872.59 in restitution under the Mandatory Victim Restitution Act (MVRA) for the fake will scheme, but concedes that the court ordered restitution in the amount of $578,912.30 under the VWPA.

According to the VWPA, the court must "consider the financial resources of the defendant, the financial needs and earning ability of the defendant . . . and other such factors the court deems appropriate." 18 U.S.C.S 3663(a). We have asked the district courts to " `make specific findings as to the factual issues that are relevant to the application of the restitution provisions of the VWPA.' " United States v. Logar, 975 F.2d 958, 961 (3d Cir. 1992) (quoting United States v. Palma, 760 F.2d 475, 480 (3d Cir. 1985)). Because the District Court did not undertake the factual inquiry that is required of it before determining the amount of restitution Holmes should pay for all the offenses falling under the purview of the VWPA, we are obliged to vacate the restitution order and remand the case so that the necessary factual findings may be made concerning Holmes' ability to pay.

C.

Holmes also argues that the District Court erred in imposing the special assessment of $8,650. Holmes failed to object to the special assessment and thus we review for plain error.

As Holmes notes correctly, the special assessment was based on 165 counts from the two indictments. However, on July 31, 1998, the District Court dismissed 114 of the 165 counts pursuant to the government's request. Therefore, the assessment should have been based on 51 counts, the number of counts left after the dismissal. Holmes argues the correct total should be $2,950, which he computes as $50 per count for the 43 counts on offenses occurring prior to April 24, 1996, and $100 per count for the 8 counts on offenses occurring after April 24, 1996. The government agrees that we must remand for this purpose. On remand, the District Court will have the opportunity to impose the correct total special assessment.

III.

For the reasons set forth, we will affirm the judgment of conviction and the portion of the sentence that sets the term of imprisonment. We will vacate so much of the sentence as imposes the order of restitution and the special assessment and remand for further proceedings.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

10