

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-18-1996

# United States v. Sokolow

Precedential or Non-Precedential:

Docket 95-1292,95-1367

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Sokolow" (1996). *1996 Decisions.* Paper 201.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/201

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 95-1292/1367
_____

UNITED STATES OF AMERICA

vs.

CRAIG B. SOKOLOW,

Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 93-cr-00394)
_____

Argued
January 22, 1996
BEFORE: MANSMANN and SCIRICA, Circuit  Judges,
and RESTANI, Judge, Court of International Trade.[0]

(Filed April 18, 1996)
_____

John Rogers Carroll
Johanna E. Markind
Carroll & Carroll
400 Market Street, Suite 850
Philadelphia, PA 19106

Peter Goldberger (Argued)
Anna M. Durbin
Pamela A. Wilk
50 Rittenhouse Place
Ardmore, PA 19003-2276

    COUNSEL FOR APPELLANT

Michael R. Stiles
United States Attorney
Walter S. Batty, Jr.

_____

[0]    *    Honorable Jane A. Restani, Judge, United States Court of
         International Trade, sitting by designation.

1

Chief of Appeals
Joseph T. LaBrum, III (Argued)
Maryanne Donaghy
Sarah L. Grieb
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

    COUNSEL FOR APPELLEE

———————

OPINION OF THE COURT

———————


RESTANI, Judge.

Defendant Craig B. Sokolow ("Sokolow") appeals from his conviction in the United States District Court for the Eastern District of Pennsylvania following a two month jury trial. On March 18, 1994, Sokolow was convicted of 107 counts of mail fraud in violation of 18 U.S.C. § 1341 (1988), 17 counts of money laundering in violation of 18 U.S.C. § 1957 (1988), and one count of criminal forfeiture in violation of 18 U.S.C. § 982 (1988). Following several sentencing hearings, the district judge sentenced Sokolow to 92 months in prison, to be followed by three years supervised release, and ordered a $50,000 fine, $6200 in special assessments, $690,246.34 in restitution, and the forfeiture of $2.1 million. On appeal, defendant challenges both his conviction and sentencing. For the reasons stated herein, we will affirm the conviction, sentencing, and the order of forfeiture, but remand for reconsideration of the restitution order.


I.  BACKGROUND

The events leading to Sokolow's indictment and subsequent conviction occurred between May 1, 1987 and July 23, 1990. Sokolow, an attorney and licensed insurance agent, offered health benefits plans to the public in Pennsylvania and several other states through a series of corporations that he established and controlled, but primarily through the National Independent Business Association, Inc. ("NIBA").[0] The plans were marketed to small business employers, their employees, and their families. Association Insurance Marketing, Inc. ("AIM"), a corporation established and controlled by Sokolow, served as the primary marketing arm of NIBA. Through AIM, Sokolow received commissions on all premiums received for the sale of NIBA policies.

Prior to May 1987, NIBA members were fully insured by NIBA's group insurance contract with World Life and Health Insurance Company ("World Company"). On May 1, 1987, Sokolow replaced World Life with Independence Blue Cross and Pennsylvania Blue Shield to administer and process NIBA's health care claims. Sokolow purchased stop-loss coverage from Blue Cross, whereby NIBA assumed responsibility for the payment of NIBA members' medical care claims up to the first $25,000. Blue Cross would pay any remaining claims in excess of $25,000. The indictment charged that Sokolow falsely represented to the public that NIBA

---

[0]    In 1984, Sokolow began offering his health benefits plan through the Pennsylvania Independent Business Association, Inc. ("PIBA"). NIBA was established as a successor to PIBA in 1987. In 1988, NIBA was succeeded by the American Independent Business Alliance, Inc. ("AIBA"), the association existing until the time of liquidation on February 15, 1990. For convenience, "NIBA" will be used throughout the opinion to refer to the various corporations.

was fully-insured by Blue Cross, when, in fact, it was a self-funded plan, thus defrauding members of their premiums. In addition, Sokolow allegedly used the Blue Cross logo on marketing and billing materials, in violation of NIBA's agreement with Blue Cross, to foster the impression that NIBA was the equivalent of a Blue Cross fully-insured health benefits plan.

On June 30, 1988, Blue Cross terminated its service plan with NIBA when Sokolow failed to pay approximately $2 million in claims for which Blue Cross sought reimbursement. Sokolow then contracted with another company for higher stop-loss coverage that required NIBA to pay the first $50,000 of a member's medical care claims. The indictment alleged that Sokolow again misrepresented that NIBA was fully insured by the new coverage, when, in fact, it was self-funded.

After receiving complaints concerning NIBA's claims administration in late 1988, the Pennsylvania Insurance Department (the "Department") began to investigate NIBA's operations. The Department determined that Sokolow had been operating NIBA as an illegal, unlicensed insurer in Pennsylvania. Sokolow objected to the Department's inquiries on the basis that NIBA was a Multi-Employer Welfare Arrangement ("MEWA") that could file a benefits plan under ERISA and, thus, was not subject to state regulation.[0] The Department disagreed with Sokolow's

---

[0] Although Sokolow represented to the Department that he <u>could</u> have filed the NIBA plan under ERISA, the evidence at trial indicated that Sokolow represented to Virginia and Maryland insurance regulators that the NIBA health plan was, in fact, filed as an ERISA plan with the United States Department of Labor, and, thus, not subject to state regulation. Trial

4

contentions and, on May 2, 1989, suspended NIBA's operations. On August 31, 1989, the Commonwealth Court of Pennsylvania ruled that NIBA did not constitute a valid MEWA plan, but was a commercial enterprise "marketing insurance, without the benefit of a licensed company status, while purporting to be a valid ERISA plan, such that state licensing would not be necessary."[0] Appellant's App. [hereinafter "App."] at 1193. Consequently, NIBA was ordered liquidated by the commonwealth court on February 15, 1990.

Sokolow collected more than $34 million in premiums from NIBA plan members who were allegedly defrauded by Sokolow during the period covered by the indictment. The indictment alleged that Sokolow converted approximately $4 million of the premiums for his personal benefit. He received $2,239,575.67 in commissions through AIM and two other related insurance companies[0] ($1,837,152.30 of those commissions went to AIM) and $1,806,259.23 in salary, officer's loans, and other disbursements. These monies were deposited into AIM and NIBA accounts. The indictment alleged that Sokolow laundered these

---

testimony established, however, that Sokolow never filed the NIBA plan with ERISA for the years 1987 through 1990.

[0] For purposes of determining insurance agents' liability, a later en banc ruling of the commonwealth court found that NIBA was a MEWA and not an insurance entity operating under Pennsylvania state law. Pennsylvania Ass'n of Life Underwriters v. Foster, 645 A.2d 907, 911–12 (Pa. Commw. Ct. 1994) (en banc), aff'd without op., 668 A.2d 1113 (Pa. 1995) (per curiam).

[0] The related companies were Sokolow & McMillan, and Sokolow, McMillan & O'Leary, two "in-house" insurance agencies of which Sokolow was a partner, and which sold NIBA health benefits plans.

funds through a number of bank and brokerage accounts, as well as real property and mortgages.

The jury trial commenced on January 10, 1994, and concluded on March 18, 1994, with the return of guilty verdicts on all counts considered by the jury. Sentencing proceedings were held on January 6 and 11, and February 6, 1995, during which sentencing issues were argued, and evidence of forfeiture, loss calculations, and restitution was presented. On March 14, 1995, the district court filed three separate Memorandum Opinions and Orders, inter alia, determining the Sentencing Guidelines calculations, and ordering the restitution and forfeiture obligation. Following entry of judgment, Sokolow filed this timely appeal challenging both his conviction and sentence.

## II. CHALLENGES TO THE CONVICTION

### A. Evidentiary Challenges

Sokolow challenges three evidentiary rulings made by the district court. Sokolow claims that the district court (1) erred in admitting into evidence Government Exhibit B-110 ("Gov't Ex. B-110"), a summary of unpaid insurance claims of NIBA members; (2) improperly allowed evidence of NIBA's alleged operation as an unlicensed insurance company; and (3) abused its discretion in admitting irrelevant and highly prejudicial victim impact testimony. To the extent the district court's admission of evidence was based on an interpretation of the Federal Rules of Evidence, our standard of review is plenary. See United States v. Furst, 886 F.2d 558, 571 (3d Cir. 1989), cert denied, 493 U.S.

6

1062 (1990). Our review of a district court's ruling to admit or exclude evidence, if premised on a permissible view of the law, however, is only for an abuse of discretion. See id.; see also United States v. Versaint, 849 F.2d 827, 831 (3d Cir. 1988). We will address each of Sokolow's evidentiary challenges in turn.

### 1. Government Exhibit B-110

Sokolow contends that Gov't Ex. B-110 is inadmissible hearsay. Gov't Ex. B-110 is a compilation and summary of over $7 million in unpaid insurance claims of NIBA members. The document was prepared for the Department in July 1992 by Inservco, a third-party administrator hired to adjust the unpaid claims after the commonwealth court ordered the liquidation of NIBA. Originally, NIBA members' claims were documented in the course of regularly conducted business by NIBA's third party administrators -- National Benefits Corp., Insurance Benefits Services ("IBS"), and Independent Insurance Administrators ("IIA"). The companies processed NIBA claims and kept records on behalf of NIBA, which Sokolow later authorized to be turned over to the Department's Statutory Liquidator in connection with NIBA's liquidation. As custodian of the NIBA plan records, the Statutory Liquidator made the records available to Inservco for the adjustment of unpaid claims.

Over Sokolow's objection, the district court admitted the exhibit as an admission by Sokolow, under Federal Rule of Evidence 801(d)(2)(C).[0] The district court reasoned:

_____

[0] Rule 801(d)(2)(C) provides that

7

> Inservco summarized information held by the Statutory Liquidator, who in turn obtained the information from another administrator hired by Sokolow. Each entity that held the information had the express authorization of [Sokolow]. As such, Exhibit B-110 is a party admission . . . .

United States v. Sokolow, No. 93-394-01, 1994 WL 613640, at *5 (E.D. Pa. Nov. 1, 1994). We disagree with the district court's reasoning.

Rule 801(d)(2)(C) specifically excludes from the definition of hearsay any statements used against a party which were made by another person authorized by the party to make a statement concerning the subject. Fed. R. Evid. 801(d)(2)(C); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1198 (3d Cir. 1993). We find, and the government admits, that Inservco's adjustments to the NIBA members' claims were not "done with Sokolow's consent or at his direction," and, thus, are not admissions by Sokolow. See Appellee's Br. at 23. The government continues to assert, however, that the collection of these claims by NIBA's third-party administrators constitutes an admission by Sokolow, and are, thus, not hearsay. This argument is untenable. Rule 801(d)(2)(C) requires that the declarant be an agent of the party-opponent against whom the admission is offered. Kirk v. Raymark Indus., Inc., 61 F.3d 147, 164 (3d Cir. 1995), cert. denied, 116 S.Ct. 1015 (1996). We find that neither the underlying claims submitted by NIBA insurance beneficiaries to

_____

> [a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a person authorized by the party to make a statement concerning the subject.

Fed. R. Evid. 801(d)(2)(C).

8

NIBA's third-party administrators nor Sokolow's subsequent release of these records to the Department constitutes an admission by Sokolow. Thus, Gov't Ex. B-110 is hearsay because the entries of NIBA members' claims, whether or not adjusted by Inservco, were written out-of-court statements offered to prove not merely the existence but the genuineness of the claims, and ultimately, the underfunding of Sokolow's enterprise.

We now turn to whether Gov't Ex. B-110 falls within one of the exceptions to the hearsay exclusion. The government argues that Gov't Ex. B-110 is admissible under the business records exception to the hearsay rule.[0] This exception allows the admission of hearsay documents provided a foundation is laid by "the custodian or other qualified witness" that:

> (1) [t]he declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

---

[0] Pursuant to Rule 803(6), the following are not excluded by the hearsay rule even though the declarant is available as a witness:

> **Records of regularly conducted activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6).

United States v. Pelullo, 964 F.2d 193, 200 (3d Cir. 1992).

We find that Gov't Ex. B-110 is admissible under the business records exception. Contrary to Sokolow's contentions, the NIBA members' claims were collected in the course of regularly conducted business of NIBA's original claims administrators. IIA initially received NIBA plan member information from IBS, a prior third party administrator, with Sokolow's consent and authorization. Pursuant to the liquidation order, Sokolow specifically authorized the IIA to "release any and all data base information as required concerning [NIBA] on the in-house history tapes and claims system to the [Department]." App. at 826. Joseph DiMemmo testified that as the representative of the Statutory Liquidator, he took custody of all NIBA records. We find that a clear chain of custody and foundation for this data, upon which Inservco based its claims adjustment, was established.

As to the claim adjustments made by Inservco, and summarized in Gov't Ex. B-110, we find that this data also falls within the business records exception. As a third party administrator, Inservco contracted with the Department to administer NIBA health insurance claims. The claims adjustments made by Inservco were the same type of adjustments NIBA's third party administrators would have had to make if NIBA had stayed in business. Margaret Lee attested to the authenticity of Gov't Ex. B-110 and laid the foundation for its admission. Lee testified that Gov't Ex. B-110 was derived from Inservco's claims processing system and that these records were made and kept in Inservco's regular course of

10

business. In sum, we find that the government properly established the admissibility of Gov't Ex. B-110 under the business records exception to the hearsay rule.

Defendant asserts, however, that the methods and circumstances under which Inservco prepared the summary of claims were untrustworthy and unreliable. Sokolow argues that many claims were not checked for pre-existing conditions, double submissions, or the timeliness of the claims. We disagree. Inservco adjusted the claims according to NIBA policy guidelines, and these adjustments were subject to committee review and oversight by the Department. Final approval of the claim adjustments was made by the Department. Although the adjustments made by Inservco did not take into account the timeliness of claims, trial testimony indicated that this information could not be determined from the submissions made to the Department. Further, Sokolow offers no specific evidence that the claims were not properly inspected by Inservco. Much of the evidence indicates the contrary. In any event, such questions go to the weight to be given to Gov't Ex. B-110, and not its admissibility.

Finally, Sokolow claims that Gov't Ex. B-110 is a public report under Federal Rule of Evidence 803(8)(C),[0] and, thus,

---

[0] Rule 803(8)(C) excepts from the hearsay rule, even though the declarant is available as a witness:

> **Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth, . . . in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of

11

should be excluded under the rationale set forth in <u>United States v. Oates</u>, 560 F.2d 45 (2d Cir. 1977). There the court held that, "police and evaluative reports not satisfying the standards of [Federal Rules of Evidence] 803(8)(B) and (C) may not qualify for admission under [Rule] 803(6) or any of the other exceptions to the hearsay rule." <u>Id.</u> at 77. Generally, a public report consisting of "factual findings resulting from an investigation made pursuant to authority granted by law," is not admissible against a criminal defendant under Rule 803(8)(C). We agree with Sokolow that Gov't Ex. B-110 contains some indicia of a public report under Rule 803(8)(C). In processing NIBA members' claims, Inservco was performing a fact-finding function and acting essentially as the agent of the Department, which was required to liquidate NIBA pursuant to state law. We disagree, however, with Sokolow's contention that the findings made by the Department, <u>i.e.</u> Inservco's adjustments, were inadmissible under the <u>Oates</u> rule.

Criticizing <u>Oates</u> as an unduly broad interpretation of Rule 803(8), many courts have declined to import the limitations of Rule 803(8)(B)[0] and (C) into other hearsay exceptions. See,

information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8)(C).
[0] Rule 803(8)(B) excepts from the hearsay rule, even though the declarant is available as a witness:

**Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth, . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding,

12

e.g., <u>United States v. Picciandra</u>, 788 F.2d 39, 44 (1st Cir.) (upholding admission of DEA report against criminal defendants under Rule 803(5) (past recollection recorded)), <u>cert. denied</u>, 479 U.S. 847 (1986); <u>United States v. Metzger</u>, 778 F.2d 1195, 1201 (6th Cir. 1985) (declining to read Rule 803(8)(C) limitations into Rule 803(10) (absence of public record or entry)), <u>cert. denied</u>, 477 U.S. 906 (1986). Although we have not specifically addressed this issue,[0] the Seventh and Tenth Circuits have held that Rule 803(8)(C) does not compel the exclusion of documents properly admitted under Rule 803(6) where the author testifies. <u>See</u> <u>United States v. Hayes</u>, 861 F.2d 1225, 1230 (10th Cir. 1988); <u>United States v. King</u>, 613 F.2d 670, 672–73 (7th Cir. 1980). The <u>Hayes</u> court stated that the <u>Oates</u> rule does not apply in such circumstances "because such [investigator] testimony protects against the loss of an accused's confrontation rights, the underlying rationale for Rule 803(8) and the basis of the court's concern in <u>Oates</u>." 861 F.2d at 1230 (citation omitted). We reach the same conclusion here.

---

however, in criminal cases matters observed by police officers and other law enforcement personnel.

Fed. R. Evid. 803(8)(B).

[0] In <u>United States v. Wright–Barker</u>, 784 F.2d 161, 173 (3d Cir. 1986), we declined to address the applicability of the <u>Oates</u> rule to the admission of a Coast Guard report against criminal defendants under Rule 803(6), the business records exception. Even assuming inadmissibility, we found any error to be harmless. <u>Id.</u> We also noted the many exceptions to the <u>Oates</u> rule, such as the admission of law enforcement reports under Rule 803(6) where the author is available to testify at trial. <u>Id.</u> at 173 n.12. We declined, however, to decide the appropriateness or applicability of such exceptions. <u>Id.</u>

13

Here, Margaret Lee, the Inservco employee who supervised the claims adjustments, testified and was cross-examined at some length.  Lee personally audited part or all of each submitted claim and stated that Gov't Ex. B-110 represented the results of Inservco's processing of the NIBA members' claims.  We find that the circumstances surrounding the preparation of Gov't Ex. B-110 were probed and there was no loss of confrontation rights.  Thus, Gov't Ex. B-110 was properly admissible under the business records exception of Rule 803(6), and we will affirm on that basis.

## 2.  Evidence of NIBA's Non-Licensure

At trial, the district court permitted the reading into evidence of portions of a ruling made by the Commonwealth Court of Pennsylvania upholding the NIBA suspension order entered by the Department.[0]  Denying Sokolow's motion to strike, the

---

[0]  Relevant excerpts read as follows:

> The activities conducted by [NIBA] clearly indicate to the Court as a matter of fact and law that [NIBA's] business operation clearly was not a valid ERISA employment benefit plan.
>
> . . . .
>
> The Court finds that NIBA was a means by which its principal[,] Craig Sokolow[,] was marketing insurance without the benefit of licensed company status while purporting to be a valid ERISA plan, such that state licensing would not be necessary.
>
> . . . .
>
> Since [NIBA] conducted business in Pennsylvania as an insurer without a license, it was appropriate for the Commissioner to intervene and take the drastic action of suspension.

14

district court ruled that "the probative value [of the opinion] outweigh[ed] the prejudicial value." App. at 608. In addition, various testimony regarding the non-licensure of NIBA was permitted to be addressed.

Sokolow asserts that the district court erred in admitting this evidence. He argues that (1) the allegations of violations of state law were confusing and unduly prejudicial, (2) NIBA's alleged non-licensure was not an element of the mail fraud scheme alleged in the indictment, (3) prejudicial effect is highlighted by the fact that the deliberating jury requested Judge Colins's opinion, and (4) the groundlessness of Judge Colins's opinion is supported by an en banc decision in a related case by the commonwealth court, which found NIBA was a MEWA and not an insurance entity under state law. See supra note 3.

We find that the district court did not abuse its discretion in admitting this evidence. Under Federal Rule of Evidence 403, "[relevant] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. According to the government, the evidence of non-licensure and the reading of Judge Colins's opinion was for the purpose of providing background information regarding the suspension and liquidation of NIBA. The non-licensure of NIBA was a factual allegation in the indictment which would demonstrate the nature

---

App. at 560-61, 1193 [hereinafter "Judge Colins's opinion"].

15

of the fraud scheme and show the factual predicate for NIBA's suspension and liquidation.

Sokolow asserts that the evidence of non-licensure was unduly prejudicial and confusing, as evidenced by the jury's request for Judge Colins's opinion. We disagree. In responding to the jury's request, the district judge submitted the following instruction, agreed to by the parties, rather than the requested opinion:[0]

> [Judge Colins's opinion] was referred to in the evidence to give a historical background of the proceedings. The opinion of Judge Collins [sic] is just that, an opinion. Judge Collins [sic] was not a witness to the facts. You have seen and heard the witnesses. You must make your decision on the basis of the witnesses['] testimony, exhibits relating to facts and the stipulations of counsel – pursuant to my instructions on the law.

App. at 1203. We find that any prejudicial effect was remedied by this instruction. Additionally, as indicated, Judge Colins's ruling formed the basis for the liquidation of NIBA, and although non-licensure was not an element of the mail fraud or money laundering charges, it was a necessary factual predicate to the mail fraud scheme. Sokolow claimed to have created a valid health benefits plan filed with the Department of Labor and operating under ERISA, when in fact, no such filing was ever made. Accordingly, we find the district court did not abuse its discretion in admitting evidence of NIBA's non-licensure.[0]

---

[0]    Sokolow's counsel, although agreeing to the instruction, continued his objection to the admissibility of Judge Colins's opinion.

[0]    Sokolow also contends that the district court's ruling on this issue amounted to collateral estoppel against him. See United States v. Pelullo, 14 F.3d 881, 897 (3d Cir. 1994)

16

### 3. Victim Impact Testimony

Sokolow asserts that the district court abused its discretion in permitting highly prejudicial victim impact testimony to be admitted at trial. The district court allowed 20 NIBA members to testify that they were denied payment of their claims. Some witnesses were also permitted to testify as to collateral losses that they suffered. One witness, Kenneth Harris, who was injured in an auto race, was permitted to testify as to $238,111.46 in unpaid claims, and to his long hospitalization and prolonged rehabilitation. Additionally, he was permitted to testify as to problems with collection agencies. A year after the jury's verdict, the district court found that Harris's claims were "caused by non-covered activity," and, thus, he was not entitled to restitution. Sokolow also points to the testimony of Frank Yeager, who became a quadriplegic as a result of a gunshot wound. Sokolow asserts that collateral testimony as to this witness's injury, and repeated reference to the injury by government counsel in closing arguments, were unduly prejudicial.

In general, to satisfy the elements for mail fraud, "[p]roof of actual loss by the intended victim is not necessary." United States v. Copple, 24 F.3d 535, 544 (3d Cir.), cert. denied, 115

---

(holding that defendant's prior conviction by jury for wire fraud could not be used as collateral estoppel to establish predicate act for violation of RICO in trial before second jury). Sokolow's claim is unavailing. The district court denied the government's motion in limine to preclude re-litigation of whether NIBA was an unlicensed insurer or qualified as a MEWA under ERISA. Further, as indicated, NIBA's non-licensure was a factual allegation in the mail fraud scheme charged in the indictment. The government established at trial that NIBA was neither properly filed with the Department of Labor, nor operating under ERISA, as Sokolow had falsely represented to various state insurance regulators.

17

S.Ct. 488 (1994). Evidence of loss, however, may be treated as evidence of the schemer's intent to defraud. See id. at 545. In Copple, we found that extensive victim impact testimony as to collateral losses "went beyond anything that was reasonable to prove [defendant's] specific intent to defraud." Id. In that case, some of the objectionable collateral impact testimony included testimony that money used to pay back losses came from savings for children's college educations, that paying back the money had affected the witnesses' health, caused weight loss, and required depletion of all personal savings. Id. at 545–46. Accordingly, the court found that the district court erred in allowing the testimony as the "[t]estimony was designed to generate feelings of sympathy for the victims and outrage toward [defendant] for reasons not relevant to the charges [defendant] faced." Id. at 546.

In the case before us, the victims testified to a careful account of the dollar value of the loss suffered as a result of the fraud. Many of the victims also provided significant embellishment concerning adverse personal consequences, similar to the victims in Copple.[0] By asking every victim who testified whether he or she suffered any adverse consequences from the

---

[0] For example, Suzanne Plattner testified that she had been hassled by collection agencies, suffered from depression, and was completely tormented; David Ahakinian testified that "his life had been destroyed," that he was a "nervous wreck," and that he had attorney's bills to pay because his claim was denied. He further testified that Sokolow had "created a monster company." In addition, it appears that the claims of David Ahakinian and Kenneth Harris were properly denied coverage, yet the district court allowed into evidence their testimony regarding economic loss as well as adverse consequences.

18

unpaid claims, the government was attempting to highlight the personal tragedies of the victims.

Such testimony has little, if any, probative value and may be unfairly prejudicial. While normally the balancing under Federal Rule of Evidence 403 is done by the district court, for purposes of this discussion, we can assume, arguendo, that the testimony was in fact prejudicial because we believe that its admission was harmless.[0] "Trial error is harmless if it is highly probable that the error did not affect the judgment." Id. (citing United States v. Simon, 995 F.2d 1236, 1244 (3d Cir. 1993)). We stated in Simon that a high probability exists where the court has a "'sure conviction that the error did not prejudice the defendant.'" 995 F.2d at 1244 (quoting United States v. Asher, 854 F.2d 1483, 1500 (3d Cir. 1988) (citation omitted), cert. denied, 488 U.S. 1029 (1989)). In making this determination, we are not required to "disprov[e] every 'reasonable possibility of prejudice.'" Id. (citations omitted).

Here the error of admitting the adverse consequences testimony was harmless because, as in Copple, 24 F.3d at 526-47, the evidence of the scheme to defraud and of Sokolow's specific intent was overwhelming. As we have set forth above, the record is replete with proof of Sokolow's intentional misrepresentations to small business employers and employees and concealment of material facts which induced them to purchase what they believed

---

[0] Except for the testimony of Kenneth Harris, Judge Scirica does not believe the other victims' testimony was prejudicial. In any event, the errors, if any, were harmless.

19

to be fully insured health care coverage.  Substantial evidence of the actual scheme to defraud was also presented at trial. Eighteen of the twenty victim-witnesses who testified were improperly denied coverage even though they paid premiums for what they believed to be a fully insured health care plan. Sokolow was forced to deny claims to make up for a shortage in the claims reserve fund, since he diverted a large portion of the collected premiums to his personal bank accounts.  Thus, it is "highly probable" that Sokolow would have been convicted of mail fraud even without adverse consequences testimony.  Any error, therefore, was harmless.

> B.    Defendant's Challenges to Jury Instructions
>    1.    Scienter Element for Violation of Money Laundering Under 18 U.S.C. § 1957

Sokolow asserts that the district court improperly instructed the jury on the scienter element of 18 U.S.C. §1957.[0]

---

[0]   The district court's instructions to the jury regarding the money laundering offense, read as follows:

[T]here are five elements in money laundering:

1.    The Government must prove beyond a reasonable doubt the defendant knowingly engaged or attempted to engage in a monetary transaction.
2.    The defendant knew the transaction involved in this case, I am going to use the word money, monies that were criminally received.
3.    The criminally derived property must have a value in excess of $10,000.
4.    The criminally derived property must have been in fact derived from a specified unlawful activity. That's the money laundering counts.
5.    The money transaction must have taken place in the United States of America.

App. at 944-45.

That section makes it unlawful for a person to " knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Id. The elements necessary to prove a violation of § 1957 are that

> (1) the defendant engage or attempt to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from 'specified unlawful activity.'

United States v. Johnson, 971 F.2d 562, 567 n.3 (10th Cir. 1992).

Defendant contends that the knowledge requirement of § 1957 requires "proof that Sokolow knew his conduct was prohibited by law." As Sokolow never objected to the instructions at issue, the court's review is limited to plain error, that is, the error must be "plain" and "affect[] substantial rights." See United States v. Retos, 25 F.3d 1220, 1228-29 (3d Cir. 1994) (quoting United States v. Olano, 113 S.Ct. 1770, 1777 (1993); see also Fed. R. Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

In support of his argument, Sokolow relies primarily upon the Supreme Court decision in Ratzlaf v. United States, 114 S.Ct. 655 (1994). In Ratzlaf, the defendant was charged with violating 31 U.S.C. § 5324, which makes it unlawful for a person to "structure" numerous transactions with several banks to evade the banks' obligation to report cash transactions exceeding $10,000.

21

See id. at 658. Section 5322(a), Title 31, United States Code, imposes criminal penalties for a "person willfully violating" the antistructuring provision. At issue was the trial court's instruction that the government did not have to prove the defendant knew the "structuring" in which he engaged was unlawful, but only that the defendant knew of the reporting obligation and attempted to evade that obligation. In reversing the court of appeals, which upheld the conviction, the Supreme Court held that in order to give effect to § 5322(a)'s "willfulness" requirement, the government must prove that the defendant knew the structuring in which he was engaged was unlawful. 114 S.Ct. at 663. The Court was unpersuaded by arguments that the offense of structuring is "so obviously 'evil' or inherently 'bad' that the 'willfulness' requirement [of § 5324 is] satisfied irrespective of the defendant's knowledge of the illegality of structuring." Id. at 662.

Sokolow claims that the offense of money laundering is analogous to the offense at issue in Ratzlaf. He argues that engaging in monetary transactions, such as bank depositing, with known criminal proceeds is not conduct that is "obviously evil or inherently bad." Sokolow contends the jury must find that he knew his spending and regular bank transactions were prohibited by law.

Absent a "willfulness" requirement, however, we will not require proof of knowledge of illegality to sustain a conviction under the money laundering provision of 18 U.S.C. § 1957. In United States v. Zehrbach, 47 F.3d 1252, 1261 (3d Cir.), cert.

22

denied, 115 S.Ct. 1699 (1995), in discussing the proof necessary for bankruptcy fraud, we stated that "[t]he statutory requirement that the underlying acts be performed 'knowingly' requires only that the act be voluntary and intentional and not that a person knows that he is breaking the law." In Zehrbach, we distinguished Ratzlaf on the basis of the "willfulness" element required under the structuring offense. Id.; see also United States v. Hilliard, 31 F.3d 1509, 1518 (10th Cir. 1994) (Ratzlaf proof of knowledge of illegality requirement not applicable to, inter alia, § 1957 money laundering provision); United States v. Santos, 20 F.3d 280, 284 n.3 (7th Cir. 1994) (Ratzlaf not applicable to § 1956 money laundering provision because of absence of willfulness requirement). Similarly, as § 1957 does not contain a willfulness requirement, we decline to adopt Ratzlaf for the money laundering provision at issue in this case.

Moreover, Sokolow's citation to our decision in United States v. Curran, 20 F.3d 560 (3d Cir. 1994), is distinguishable. In Curran, we followed Ratzlaf in construing the "willfulness" component of 18 U.S.C. § 2(b), which makes it unlawful to deliberately cause another person to perform an act that would violate federal criminal law. 20 F.3d at 566-68. In that case, defendant was charged with causing election campaign treasurers to submit false reports to the Federal Election Commission in violation of 18 U.S.C. §§ 2(b) and 1001, the false statement statute. Id. at 562. Thus, unlike the money laundering statute involved here, "willfulness" was an element of the crime at issue in Curran. See id. at 567-68. In sum, we find the district

23

court properly instructed the jury on the scienter element of Sokolow's money laundering violation.

2.   Criminally Derived Property Element of § 1957

Sokolow asserts that the district court committed plain error in the jury instruction as to the element of § 1957 that requires the criminally derived property in a monetary transaction to have a value in excess of $10,000. Specifically, Sokolow asserts that in the court's explanation of "tracing" criminal proceeds, the district court erred in stating the following:

> [T]he Government need not prove that there [sic] $20,000 came from this sale over here, because as I understand it, the Government's theory is these different sums -- they have to initially prove they came from NIBA. It has to prove that it came from NIBA, initially, but not what NIBA account.
>
> So the matter goes from $20,000 from NIBA to Sokolow & Associates and then Sokolow & Associates spends the money or spends a similar sum of money some places. They don't have to prove it's the same $20,000 that went from Sokolow's [account] to Sokolow & Associates. The Government need not prove that all the property involved in the transaction was the proceeds of the money laundering. It is sufficient if the Government proves at least part of the property represents such proceeds.

App. at 945 (emphasis on alleged error). Sokolow alleges that the instruction "allowed the jury to convict simply on a showing that even $1 of the proceeds of fraud were deposited into a Sokolow account and later used to pay, in part, for the items charged [in the counts] of the indictment." We find this contention is without merit.

It is clear from the full context of the district judge's explanation of the concept of proceeds that he is addressing the absence of a legal requirement that the government trace the

24

funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources. See United States v. Johnson, 971 F.2d at 570 (noting that there is no requirement that government "show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity."). We find no error in the district court's jury instructions in this regard.

3. Sokolow's Responsibility for Actions of His Agents

Sokolow alleges error in the district court's jury instructions as to Sokolow's responsibility for actions of his agents, particularly as it relates to "insurance agents' improper use of the Blue Cross logo on advertisements as part of the fraud scheme." The instruction read as follows:

> In order to sustain the burden of proof in this matter, it is not necessary in either of these counts to prove -- these types of crimes -- to prove that the defendant did everything, every act. A person can act through his agent, and therefore, if the acts or conduct of another were ordered by the defendant or directed by the defendant or authorized by the defendant, the law holds the defendant responsible for the acts, just as if he had personally done them. That includes both human beings and corporate agents.

App. at 945. According to Sokolow, the jury instruction is erroneous in that

> the jury could have found Sokolow guilty of mail fraud if he authorized employees to prepare marketing materials for his plan, and those employees on their own misrepresented the extent of Blue Cross underwriting in such materials. No proof that Sokolow directed the misrepresentations with an intent to defraud was demanded.

Appellant's Br. at 26. Sokolow quotes the court in Curran, 20 F.3d at 567, which stated that, "Section 2(b) [of Title 18, United States Code] imposes criminal liability on those persons

25

who possess the _mens rea_ to commit an offense and cause others to violate a criminal statute."

As defendant did not object to the jury instruction, we review the district court's failure to provide a specific instruction for plain error only. See United States v. Xavier, 2 F.3d 1281, 1287 (3d Cir. 1993). Reading the jury instructions in context, the district judge clearly explains the scienter requirements to convict Sokolow of both the mail fraud and money laundering offenses. See App. at 941 ("[T]he defendant, Mr. Sokolow, is charged with knowingly and unlawfully devising and intend[ing] to defraud the members of [NIBA] . . . and that he knowingly caused the United States [mails] to be used to execute these schemes or this scheme."); App. at 944 ("[T]he Government must prove beyond a reasonable doubt that there was -- that not only was there a fraudulent activity, but the defendant had a conscious intent to defraud. . . . [T]he defendant himself did not have to mail anything. He may or he can order someone to do it."); App. at 945 ("The Government must prove that the

defendant knew that property involved in the money transaction constituted or was derived, either directly or indirectly from a criminal offense . . . . [H]e has to know he received this money through fraudulent means. He has to be conscious of that."). The jury was instructed properly that intent to defraud was required. Thus, we find no plain error in the district court's instruction and we affirm Sokolow's conviction.

### III. CHALLENGES TO SENTENCING

#### A. Calculation Under the Sentencing Guidelines

In determining the sentencing guideline range, the district court grouped together Sokolow's mail fraud and money laundering counts pursuant to U.S.S.G. § 3D1.2(c)[0]. The higher offense level for the two groups, the money laundering offense, was used for computing the sentence. Sokolow does not contest the grouping of the counts.

#### 1. The "value of funds"

Sokolow asserts that the district court incorrectly applied the Sentencing Guidelines to determine the "value of funds" involved in the money laundering offense. The "value of funds" involved in a money laundering offense is a specific offense characteristic. U.S.S.G. § 2S1.2(b). Under § 1B1.3, specific offense characteristics are determined by "relevant conduct," defined, inter alia, as

---

[0] All references to the United States Sentencing Guidelines Manual are to the 1988 version, as used in the presentence investigation report ("PSR") and apparently adopted by the district court, unless otherwise noted. See Appellant's Br., Addendum D at 2 n.2.

27

> (1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;
>
> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.

U.S.S.G. § 1B1.3(a)(1)-(2). When reviewing a district court's sentencing decisions, the court has plenary review over questions as to the meaning of the Sentencing Guidelines. United States v. Edmonds, 52 F.3d 1236, 1244 (3d Cir. 1995). Factual determinations underlying the application of the guidelines are reviewed under the clearly erroneous standard. Id.

As to the money laundering counts, the presentence investigation report ("PSR") determined that over $2.2 million in proceeds from the unlawful mail fraud scheme had been laundered by Sokolow. PSR at 6. This amount represented the commissions received by Sokolow through AIM, and the related insurance agencies, Sokolow & McMillan, and Sokolow, McMillan & O'Leary. In addition to this amount, the district court added the additional $1.8 million Sokolow received in salary, officer's loans, and other disbursements to calculate the "value of funds" involved in the money laundering offenses under the Sentencing Guidelines. The district court concluded that Sokolow had converted $4 million from the mail fraud scheme for personal benefit, and, therefore, this amount represented the "accurate measure of harm

28

from Defendant's money laundering offenses."[0] See Appellant's Br., Addendum D, at 13. Sokolow argues the district court erroneously included the $1.8 million as relevant conduct of the money laundering offense, without determining whether that amount independently satisfied the elements of §1957, namely, that Sokolow engaged in monetary transactions in criminally derived property of a value greater than $10,000. We disagree with Sokolow's contention.

We have previously noted that the commentary to U.S.S.G. §2S1.1 does not define "the value of funds." United States v. Thompson, 40 F.3d 48, 51 (3d Cir. 1994), cert. denied, 115 S.Ct. 1390 (1995). In Thompson, we stated that "[the Commentary] states that '[t]he amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise.'" Id. In United States v. Johnson, 971 F.2d 562, 576 (10th Cir. 1992), the court stated that "the measure of harm under § 2S1.1 is the total amount of the funds involved." In dicta, the Johnson court noted that

> [F]unds associated with uncharged instances of money laundering can be added in to determine the offense level under § 2S1.1 if those acts are within the scope

---

[0] Section 2S1.2(b)(2) (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity) of the Sentencing Guidelines provides that:

> If the value of the funds exceeded $100,000, increase the offense level as specified in § 2S1.1(b)(2).

U.S.S.G. § 2S1.2. Section 2S1.1(b)(2) lists the value of funds and the corresponding increase in offense level. The Guidelines prescribe a seven level increase in the offense level when the value of funds exceeds $3,500,000.

of relevant conduct under § 1B1.3(a)(2). Thus, in determining the 'value of funds' under § 2S1.1, the district court is not necessarily limited only to the funds identified with the counts of conviction.

Id. at 576 n.10.

We find that the district court did not err in finding the additional $1.8 million as "relevant conduct" within the meaning of the sentencing guidelines. As previously noted, this amount was derived from Sokolow's unlawful mail fraud scheme. Further, Sokolow's accountant testified that the $4 million represented the total amount of funds disbursed from NIBA to Sokolow during the period relevant to the mail fraud scheme. As such acts were "part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2), we find that the $1.8 million was properly considered "relevant conduct" under the Sentencing Guidelines even though this amount was not charged in the money laundering counts. See United States v. Rose, 20 F.3d 367, 372-73 (9th Cir. 1994) (finding that uncharged acts of money laundering may be considered in determining appropriate sentence under Sentencing Guidelines).

2. Abuse of position of trust enhancement.

Sokolow received a two-level enhancement for abuse of position of trust under U.S.S.G. § 3B1.3. That section states, in relevant part:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

U.S.S.G. § 3B1.3. At the time of the relevant offenses, Application Note 1 in the commentary to this section stated the following:

> The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller.

U.S.S.G. § 3B1.3, comment. (n.1).[0]  In applying this section, "a sentencing court must determine whether a defendant was placed in a position of trust, and if he was, whether he abused that position in a way that significantly facilitated his crime." United States v. Craddock, 993 F.2d 338, 340 (3d Cir. 1993).  The inquiry into whether someone obtains a position of trust approaches a purely legal determination for which de novo review is appropriate.  Id.; see also United States v. Lieberman, 971 F.2d 989, 993 (3d Cir. 1992).  Whether or not a defendant abuses a position of trust more closely resembles a question of fact and is reviewed for clear error.  Craddock, 993 F.2d at 340.

Sokolow argued before the district court, as he does here on appeal, that enhancement for abuse of position of trust is

---

[0] Application Note 1 of the Commentary has since been clarified as follows:

> 'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3, comment. (n.1) (1994).

inappropriate because Sokolow was not in a position of trust and because there were no "victims" to the money laundering counts.[0] Relying upon United States v. Lowder, 5 F.3d 467, 473 (10th Cir. 1993), the district court rejected Sokolow's argument. In Lowder, the Tenth Circuit upheld an enhancement for abuse of position of trust for a money laundering conviction where (1) as a CPA, defendant provided tax and financial advice to elderly and unsophisticated clients; (2) he advised his clients to place their money with him and promised them security; and (3) as president of the fraudulent investment corporations, he was free to spend that money, without oversight. Id. In this case, the district court determined that Sokolow, as CEO and President of NIBA, abused a position of trust in facilitating the commission

_____

[0] At sentencing, Sokolow received a two-level upward adjustment for his organizer/leader role in the mail fraud offenses under U.S.S.G. § 3B1.1. See Appellant's Br., Addendum D, at 5; PSR, ¶ 27, at 6. Under the sentencing guidelines in effect on the date of defendant's sentencing, the abuse of a position of trust adjustment would also apply to the mail fraud offenses, in addition to the organizer/leader role enhancement. See U.S.S.G. § 3b1.3 (1994). It appears, however, that because the new guidelines would result in an increased sentence, the district court adopted the PSR's use of the sentencing guidelines in effect at the time defendant committed the offenses. See Appellant's Br., Addendum D, at 2 n.2. Thus, an upward adjustment for the abuse of position of trust could "not be employed in addition to that provided for in §3B1.1." U.S.S.G. §3B1.1. Accordingly, the abuse of position of trust enhancement could only apply to the money laundering counts. See U.S.S.G. §1.B1.11 (b)(1) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on date that the offense of conviction was committed."); see also United States v. Corrado, 53 F.3d 620, 623 (3d Cir. 1995) ("to apply a change in the guidelines that enhances the penalty would offend the ex post facto clause of the United States Constitution").

32

of the money laundering offenses.  The court relied upon the fact that Sokolow marketed his insurance plans to small-business owners and self-employed persons, and was freely able to spend the derived monies as he wished.

We agree with the district court's conclusion.  In <u>United States v. Pardo</u>, 25 F.3d 1187, 1192 (3d Cir. 1994), we explained that in determining whether a position constitutes a position of trust for purposes of § 3B1.3, a court must consider:

> (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

<u>Id.</u>  The court further stated that, "[t]hese factors should be considered in light of the guiding rationale of the section--to punish 'insiders' who abuse their position rather than those who take advantage of an available opportunity."  <u>Id.</u>

Applying the <u>Pardo</u> factors to this case, we find that Sokolow held a position of trust under U.S.S.G. § 3B1.3.  First, as President of NIBA, Sokolow was able to commit difficult-to-detect wrongs, as he had sole control over NIBA's accounts without oversight or supervision.  Second, Sokolow exercised the requisite degree of authority over the object of his wrong.  It was within Sokolow's authority to withdraw funds from NIBA and that authority was necessary for the commission of the money laundering offenses.[0]  Finally, as the district court noted, the

---

[0]  Our reference to the money laundering offenses is only to the three money laundering counts that involved the laundering of monies from NIBA accounts to other assets that Sokolow owned or controlled.  The remaining counts appear to us to have involved

funds to be laundered were derived from Sokolow's marketing of NIBA insurance plans to small business owners and self-employed persons. In selecting the NIBA health benefits plan for their employees and families, these members clearly placed a measure of reliance on the integrity of Sokolow in his position as President of NIBA. NIBA members testified to receiving materials regarding the health benefits plan, signed by Sokolow in his capacity as President.

Sokolow argues that no fiduciary relationship existed with NIBA members in connection with the submission of premiums. Unlike in Lowder, where the defendant induced elderly and unsophisticated clients to entrust money to him to invest securely on their behalf, Sokolow contends that NIBA members had no similar expectation with premiums entrusted to NIBA. We disagree. NIBA members submitted premiums with the expectation that their health care claims would be covered by NIBA. As president of NIBA, Sokolow was entrusted with the proper use of those funds. Thus, Sokolow held a formal position of trust vis-a-vis NIBA members.

As Sokolow occupied a position of trust, it must be determined whether he abused this position "in a manner that significantly facilitated the commission or concealment of the

---

only transfers of criminally derived monies from personal accounts that Sokolow owned or controlled to other assets or accounts that Sokolow owned or controlled. As to these money laundering counts, we find no position of trust warranting the enhancement. See United States v. Hickman, 991 F.2d 1110, 1112 (3d Cir. 1993) ("To abuse a position of trust, a defendant must, by definition, have taken criminal advantage of a trust relationship between himself and his victim.").

34

offense." U.S.S.G. § 3B1.3. As indicated, the district court found that Sokolow's role as president facilitated the commission of the money laundering offenses. Sokolow had significant authority over the distribution of NIBA funds. As the district court noted, Sokolow was "free to spend the money as he wished." Accordingly, we find that the district court did not clearly err in finding an abuse of position of trust. In sum, we will affirm the district court's application of the Sentencing Guidelines.

B.   The Restitution Order

The district court ordered Sokolow to pay $690,246 in restitution to 17 NIBA members in the amount of unpaid claims for medical care and treatment. According to the government, the basis for calculating the losses was Gov't Ex. B-110, the Inservco compilation of adjusted, unpaid claims. The restitution amount excluded $238,111.46 claimed by Kenneth Harris for uncovered medical care claims. The district court stated that "[t]he evidence at trial and the sentencing hearing does not support any other reductions in the amount of restitution."

Generally, the "district judge must point to evidence in the record supporting the calculation of loss to the victims." Copple, 24 F.3d at 549-50. Sokolow argues that other factual evidence in the record warrants further adjustment to many of the alleged unpaid claims. Sokolow cites five examples of NIBA members whose alleged unpaid claims should have been reduced.

> (1) Martha Mosher submitted a $12,000 claim, which was valued by the liquidator at $512. The court awarded her $51,834.99. In Gov't Ex. B-110, this

35

amount is listed as an adjusted unpaid claim for Shawn Mosher.

(2) Patricia and Gerald Ferrier's claims were valued by the statutory liquidator at zero. This amount is reflected in Gov't Ex. B-110. Yet, the district court granted them $3492 in restitution.

(3) Olivia Anderson submitted no documents in support of her claim, and a letter from the statutory liquidator stated that all her bills had been paid but one. The court granted her $47,654. Further, she is not listed in the excerpts of Gov't Ex. B-110, and the parties have not indicated from where this amount derives.

(4) David Ahakinian and William Vincent Bradford were allegedly not paid claims because they misrepresented preexisting conditions. They disputed these allegations on the witness stand. The district court awarded them $45,450 and $277,377 respectively.

See Appellant's Br. at 39-40.

Sokolow correctly contends that the basis upon which the restitution awards was granted is unclear from Gov't Ex. B-110, and often contradicted by trial testimony. We will remand the restitution order for the district court to make specific factual findings regarding the actual amount of recoverable loss sustained by these claimants.

C. The Forfeiture Order

The district court ordered Sokolow to forfeit $2,141,108.67, plus the contents of a Commonwealth Federal Savings and Loan Account, all to be satisfied from substitute assets.

1. Identifiable Forfeitable "Property"

Sokolow challenges the validity of the special verdict forms used by the jury with regard to 17 money laundering counts. As an example, the verdict forms for the counts read as follows:
ITEM 1.    $125,000.00

36

> We the jury find that the property identified as Item 1 is:
>
> a)     Property involved in the violation of money laundering (18 U.S.C. § 1957) charged in Count 126 of the Indictment and[/]or property traceable to such property.
>
> YES  _____
>
> NO   _____

App. at 974.   The jury marked "YES" for each of the monetary amounts listed for the money laundering counts.   The criminal forfeiture provision provides as follows:

> The court, in imposing sentence on a person convicted
>
> of an offense in violation of [inter alia, 18 U.S.C.
>
> §1957], shall order that the person forfeit to the
>
> United States any property, real or personal, involved
>
> in such offense, or any property traceable to such
>
> property.

18 U.S.C § 982(a) (1994).   Sokolow argues that the special verdict forms are invalid because they failed to identify specifically the property involved.   We disagree.   Federal Rule of Criminal Procedure 7(c)(2) provides that

> [n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture.

Fed. R. Crim. P. 7(c)(2).   Further, Rule 31(e) provides that

> [i]f the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any.

Fed. R. Crim. P. 31(e).   The indictment specifically alleges the amounts involved, and from where the amounts are derived.   We

37

find that the special verdict forms elicited the proper findings from the jury.

### 2. Substitutable Assets

Sokolow argues that the forfeiture of substitute assets on the basis of the invalid special verdict forms was improper. As noted above, however, the verdict forms were appropriate, and, thus, Sokolow's argument on this ground is without merit.

Sokolow also challenges the order of forfeiture of substitute assets on the basis that the government failed to demonstrate that this action was appropriate. In general, we may not set aside the district court's factual findings unless they are clearly erroneous. United States v. One 1973 Rolls Royce, 43 F.3d 794, 804 (3d Cir. 1994). Forfeiture of substitute assets may be ordered if the property traceable to money laundering, as a result of any act or omission of the defendant,

> (1) cannot be located upon the exercise of due diligence; (2) has been transferred or sold to, or deposited with, a third party; (3) has been placed beyond the jurisdiction of the court; (4) has been substantially diminished in value, or (5) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p) (1994). In this regard, the district court found that Sokolow diminished the value of certain real estate property owned by him, and transferred much of his assets to other parties and family members, over whom he still exercised control. We find no clear error in the district court's order of forfeiture of substitute assets.

### 3. Criminal Forfeiture Under Count 126

Count 126 charged Sokolow with a money laundering transaction involving $125,000 made on October 4, 1988. The most recent amendment to the forfeiture statute, however, became effective on November 18, 1988. Sokolow asserts that, on ex post facto grounds, this forfeiture should be vacated.

Prior to November 18, 1988, 18 U.S.C. § 982 permitted the forfeiture of

> any property, real or personal, which represents the gross receipts the person obtained, directly or indirectly, as a result of such offense, or which is traceable to such gross receipts.

18 U.S.C. § 982(a) (Supp. V 1987) (emphasis added). The legislative history of the statute suggested a narrow reading of the statute stating that "gross receipts" meant "only the commission earned by the money launderer . . ., and not the corpus laundered itself." S. Rep No. 433, 99th Cong., 2d Sess. 23 (1986). According to Sokolow, only later was the statute amended to cover "any property, real or personal, involved in such offense, or any property traceable to such property." Appellant's Br. at 48-49 (quoting Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690 § 6463, 102 Stat. 4374 (1988)).

Neither party has cited any case law interpreting "gross receipts" to mean the "corpus laundered." The government argues, however, that where, as here, the defendant committed the specified unlawful activity as well as the money laundering violation, the corpus of the money is the "gross receipts" to the defendant and is thus forfeitable. We agree.

39

As Sokolow was the person committing the unlawful activity of mail fraud and also laundering money derived from that unlawful activity, it is clear that he obtained the total $125,000 as the "gross receipts" of the money laundering offense. There is no need for a finding that "Sokolow paid himself a commission for laundering his own money." See Appellant's Br. at 49. The money was derived from unlawful activity, and there is no evidence indicating that this does not represent the "gross receipts" of his money laundering scheme. As review by this court is for plain error (Sokolow did not challenge this issue at trial), we find that the district court did not err in instructing the jury to determine whether the $125,000 was the amount "involved in the violation of money laundering."

## IV. CONCLUSION

In light of the foregoing, we will affirm the judgment of conviction and sentence, and the forfeiture order. We will remand for entry of a new restitution order in accordance with this opinion.